\*HUMBERT and others, *appellants*, and THE RECTOR, CHURCH-WARDENS and VESTRYMEN of TRINITY CHURCH in the city of New-York, *respondents*. [ \*587 ]

The *statute of limitations* may be interposed as a bar to relief *in equity* on a bill filed for the *settlement of boundaries* between adjoining tracts of land alleged to be confused, and praying a discovery, and also for an *account* as between *tenants in common*, the same as it may be insisted on *at law* in an action of *ejectment* or of *account ;* on the principle that where the jurisdiction of the courts is *concurrent*, time is as absolute a bar in one court as in the other.

Where from the face of the bill, it appears that the statute of limitations has attached, and that the complainant has failed to bring himself within any of its exceptions, the defendant may *demur*, and is not bound to *plead* the statute.

Even in cases of *exclusive equitable cognizance*, the statute of limitations is *generally* permitted to prevail *in equity* as well as *at law*, on the principle of analogy ; but there are exceptions (besides those enumerated in the statute,) such as frauds, trusts, &c. in which the court exercises its discretion in permitting the defence.

A naked possession of land, unaccompanied by a *claim of right*, never constitutes a bar, but enures to the benefit of the true owner.

So if a man have title as *tenant in common*, and be in possession, he is *presumed* to hold for himself and his co-tenants ; but such presumption may be rebutted by proof of acts or declarations, indicating an intention to exclude his co-tenants, such as a *disavowal* of his holding as a tenant in common ; and if he in fact keeps out his co-tenants, such acts and declarations constitute an *ouster*, and his possession from that time becomes *adverse* within the meaning of the statute.

Neither *fraud* in obtaining or continuing the possession or *knowledge* on the part of the tenant that his claim is unfounded, wrongful and fraudulent, will excuse the negligence of the owner, in not bringing his action within the prescribed period ; nor will his *ignorance* of the injury, until the statute has attached, excuse him, though such injury was *fraudulently concealed by* the contrivance of the wrong-doer.

A possession to be adverse, must be inconsistent with the title of the complainant who is out of possession ; it must be accompanied with a *claim of title*, exclusive of the rights of all others ; and must be definite, notorious, and continued for the period of 20 years.

Where there is an *actual occupation* of premises, an *oral claim* is sufficient to sustain the defence of adverse possession ; it is only where a *constructive adverse possession* is relied upon, that the claim must be founded on *color of title* by deed or other documental semblance of right.\*

\* Decided 24th December, 1840.

[ *588 ]    *APPEAL from chancery.   The appellants, in June, 1834, filed their bill before the vice chancellor of the first circuit, to *settle the boundaries* of certain lands in the city of New-York, owned respectively by the appellants and the respondents, alleged to adjoin each other ; and also to *take an account* between them of certain other lands alleged to be held by the parties as *tenants in common.*   The appellants state in their bill that *Anneke Jans Bogardus,* their ancestor, being seized of two tracts of land in the city of New-York, one called the *Dominie's Hook,* containing about 130 acres of land, and the other the *Dominie's Bowery,* containing about 62 acres, on or about 29th January, 1663, made her last will and testament, whereby she devised to her children and grandchildren all her real estate, and died in the latter part of the same year ; that the appellants are the lineal descendants of *Anneke Jans Bogardus,* and heirs at law in the line of descent from *William Bogardus* and *Sarah Roeloff* or *Roeloffson,* two of the children and devisees of *Anneke Jans Bogardus,* and that there are a large number of persons besides themselves standing in the relation of descendants of *Anneke Jans Bogardus,* who are entitled to shares and portions of the real estate devised by her, but that they are unable to give a complete list or schedule of her living descendants, and that the bill is filed in behalf of themselves and such others of her legal descendants as shall come in and contribute to the expenses of the suit.   They then allege, that in November, 1705, the defendants obtained a grant from *Edward Lord Cornbury,* then governor of the province of New-York, of a tract of land in the city of New-York, called successively the *Duke's farm,* the *King's farm* and the *Queen's farm,* and of a certain other tract called the *Queen's garden ;* the first being described as bounded *on the east* partly by Broadway, partly by the common and partly by the swamp, and *on the west* by Hudson's river ; and the second tract being described as situate on the south side of the churchyard of Trinity Church, and as fronting to Broadway *on the east,* and extending to low water mark upon Hudson's river *on the west.*

They allege that the corporation of Trinity Church,
[ *589 ]    *at the time of applying for the above grant, were fully aware and *knew* that the property contained in the grant did not embrace any part of the *Dominie's Hook* and *Dominie's Bowery,* but that in their petition for the grant they *purposely and fraudulently left the northern boundary of the premises to be covered by the grant undescribed* and unfixed, to the end and *with the intent* to avail themselves of that circumstance afterwards for extending their occupancy, under color of such grant, to other lands not properly included therein, but of which in the circumstances of the times they might be able to obtain some kind of possession, and thus if possible to make title by occupancy and lapse of time against the owners of the lands so to be wrongfully occupied as aforesaid.   They charge that any pos-

Albany, December, 1840.—Humbert v. Trinity Church.

session which the corporation may at any period have taken or held of the *Hook* and *Bowery* (except so far as legalized by a certain conveyance obtained by them from one *Cornelius Bogardus*, as afterwards more particularly set out) was taken and held *under color or pretence of Governor Cornbury's grant*, but with *full knowledge* that the same *was not thereby authorized*. They allege that at the time of Governor Cornbury's grant, the tracts called the *Hook* and *Bowery* were in the actual seizin and possession of the *Bogardus family* or some of them, under claim of full legal title and ownership to every part thereof, and that from that period *to about the year* 1785, various members of the family were in the actual use and enjoyment of different parts of the property under claim of title to the whole in behalf of themselves and their co-heirs. They then allege, that prior to the revolutionary war, Trinity Church commenced making *encroachments* upon the *Hook* and *Bowery*, by taking possession of portions thereof in pursuance of their original design, and resorted to various means for that purpose, (*particularly alluded to in the opinion of Mr. Justice Cowen, delivered in this cause.*) That this system of aggression was continued until 1785, when the corporation induced one *Cornelius Bogardus*, (who before and since the revolutionary war was in possession of part of the *Bowery*, claiming title to it and the *Hook*, for himself and his co-heirs,) to sell his birth-right in the family *estates for £700, and he accordingly conveyed to the corporation all his individual share in the two tracts called the *Dom-* [ *590 ] *inie's Hook* and the *Dominie's Bowery ;* that on receiving such conveyance, the corporation were let into the general and unrestrained possession of large portions of the Bogardus lands, and thereby became seized and possessed of the lands as *tenants in common* with all such rightful heirs and owners thereof, who had not parted with their undivided interests in the same ; and in this manner and relation continued to occupy the lands from 1785 until the filing of the bill in 1834. (*For a further detail of the matters set forth in the bill, the opinion of Mr. Justice Cowen is again referred to.*)

To this bill the respondents *demurred :* 1. Because the *parcels* of land, portions of the *Hook* and *Bowery* alleged to be in their possession are not set forth ; 2. That the complainants do not set forth the share of the lands to which they claim to be entitled to; 3. That the complainants show no title in equity to call upon the defendants touching the matters set forth in the bill ; that it is not pretended that the complainants or their ancestors have been in possession at any time since 1785 ; 4. That it is not shewn that any *action at law* has been brought by the complainants, or that any impediment exists to such action ; 5. That the bill is defective for *want of necessary parties*, apparent from the bill itself ; and 6. That the bill does not present a case entitling the complainants to discovery or relief.

The cause was brought to a hearing before the Hon. WILLIAM T. McCOUN,

*vice chancellor* of the first circuit, who made an order *allowing the demurrer* but giving leave to the complainants to amend their bill, by showing what lands claimed by them are in the possession of the defendants ; how the complainants are entitled to the same, whether by descent or otherwise, and setting forth their respective shares and interests therein.   From this decree the complainants below *appealed* to the CHANCELLOR, who on the 28th May, 1838, *affirmed* the decree allowing the demurrer, and dismissed the bill.  *See the opinion of the chancellor*, 7 *Paige*, 195.   From [ *591 ]    the decree of *the chancellor, the complainants below appealed to this court, where the cause was argued by

*H. G. Warner & G. Wood*, for the appellants.

*B. F. Butler & D. B. Ogden*, for the respondents.

*Points on the part of the appellants :*

I. The complainants are entitled to relief under two general heads of equity : 1st. To settle and adjust the boundaries which have been fraudulently confused and encroached upon by the defendants, their tenants in common, who own in severalty the adjacent premises, and whose duty it was, as such tenants in common and adjacent owners in severalty, to preserve the boundaries and landmarks distinct.    *Rouse* v. *Barker*, 3 *Bro. P. C.* 180 ; *Kiresby* v. *Farren*, 2 *Ves.* 414 ; *Norris* v. *Leneve*, 3 *Atk.* 83: *Acton* v. *Lord Exeter*, 6 *Ves.* 293 ; 1 *Story's Eq. Jurisp.* 574.   2d. To have an account against the defendants as their tenants in common of rents and profits.

II. It does not appear by the bill, so as to warrant a demurrer, that the complainants are barred of their claim by lapse of time, because, 1st. They have been tenants in common with the defendants since 1785 ; and the possession of one tenant in common is in law the possession of the other.   2d. The facts and circumstances set forth in the bill are such as to disavow the presumption of a conveyance from the complainants to the defendants of their undivided interests, or of an ouster and adverse possession, viz. : the circumstances of fraud set forth in the bill ; the repeated setting up by the defendants of their title under Bogardus ; the legal disability of the defendants to acquire their interest by purchase, and *a fortiori* to acquire them by operation of law.   *Livingston* v. *Peru Iron Co.*, 9 *Wendell*, 511.   *Jackson* v. *Hendricks*, 7 *id.* 152.   *Jackson* v. *Frost*, 5 *Cowen*, 349.

III. The premises claimed are, under the circumstances, suffi-[ *592 ]   ciently described in the bill of complaint, because, 1st. *The ancient description is fully given, the title being an ancient one. 2d. The reason for not giving a more full description according to their pre-

sent situation, is sufficiently accounted for ; the difficulty being caused by the acts of the defendants themselves, whose duty it was to preserve the landmarks. 3d. Less particularity in pleading is required in equity. *Spurrier* v. *Fitzgerald*, 6 *Vesey*, 556. *Equity Draftsman*, 323.

IV. The complainants are entitled to a discovery from the defendants of the boundaries of the premises claimed, as incident to the equitable relief they are entitled to, and for the reasons stated in the first and third points.

V. The pedigree of the complainants, connecting them with their ancestor, from whom their ancient title was derived, is sufficiently set forth, because, 1st. Generality of pleading is allowable in stating ancient facts, especially in a court of equity. 2d. The word *heir* involves matters of fact as well as law, and it is sufficient to allege that a party i s*heir* of another, without detailing the circumstances of relationship. 2 *Chit. Plead.* 208. 2 *Saund.* 7, *n.* 4. 3d. The law of primogeniture did not prevail and govern the descents among the Dutch inhabitants of the colony of New-York, in respect to their inheritances, upon the introduction of the English government or of English law.

VI. An action at law was not necessary in the present case previous to exhibiting the bill.

VII. The parties being very numerous, as alleged in the bill, and having a common right, it is sufficient for some to sue as complainants on behalf of themselves and others.

VIII. Even if it were true that some of the plaintiffs had no title, that is not fatal in a bill of this kind, which the law allows for convenience sake, and will not suffer to be defeated by an objection of misjoinder, only applicable to cases of joint demands.

*Points on the part of the respondents :*

I. It appears on the face of the bill, that the defendants have been in the exclusive possession of the premises in *question from [ *593 ] the year 1785, to the filing of the bill in this cause in June, 1834, being nearly 50 years, claiming them during the whole time as their own. This length of possession is a bar to the claim set up in the bill. *Cases cited by the chancellor, in his opinion in this case, Bogardus* v. *Trinity Church,* 4 *Paige's Ch. R.* 178 ; *S. C. on appeal,* 15 *Wendell,* 111. *Cholmondeley* v. *Clinton,* 2 *Jac. & Walk.* 1, 192, *S. C.* 1 *Turn. & Russ.* 107. *Mitf. Plead. 4th ed.* 107, 108, 163, *and cases there cited.* *McElwain* v. *Willis,* 9 *Wendell,* 548, 561. *Hovenden* v. *Annesly,* 2 *Sch. & Lef.* 636. *Livingston* v. *Livingston,* 4 *Johns. Ch. R.* 299. *Story's Eq. Plead.* 389.

II. The bill shows no sufficient legal title in the complainants to the lands in question, or any part of them. *Mitf. Plead.* 41, 42, 154, *and cases there cited.* *Edwards* v. *Edwards,* 1 *Jacob's R.* 335. *King of Spain* v.

*Marhado*, 4 *Russ. R.* 225.   *Cliff* v. *Platelt*, *id.* 242.   *Makepeace* v. *Haythorne*, *id.* 244.

III. The bill is not sufficiently certain and particular as to the lands in possession of the defendants, which the complainants claim, nor as to their respective shares or interests (if any) therein.   *Cases above cited.*   *Looker* v. *Rolle*, 3 *Ves.* 4.   *Jones* v. *Jones*, 3 *Meriv.* 161.   *Crow* v. *Tyrrell*, 3 *Mad.* 179.   *Moulton* v. *Smith*, 3 *Ans.* 99.

After advisement, the following opinions were delivered :

By COWEN, J.   Both the learned officers who considered this case in the court below agreed that the bill failed to show that any of the complainants, or those under whom they claim, had been in actual possession of the premises in question since 1785.   On the contrary, they considered it as admitting possession in the defendants since that time.   But they differed as to the character of this possession, the vice chancellor holding that it was not *adverse* within the meaning of the statute of limitations, the chancellor holding that it was.

[ *594 ]   The bill is in the two fold nature of an action of ejectment and an action of account.   It is brought to settle *boundaries, and to take an account between alleged tenants in common.   The legal bar to the action of ejectment is fixed by the statute at twenty years, and to an action of account at six years.   The two claims being not exclusively of an equitable character, but capable of enforcement either in a court of law or equity at the election of the complainants, the court of chancery and this court are bound, in passing judgment, to apply the same principles in sustaining the complainants' claims, in allowing bars to their remedy, and receiving answers to avoid or overcome such bars, as would prevail in an action of ejectment or of account itself.   The statutes of limitation do not mention (at least, the earlier statutes did not mention) bills in equity as the subject of a bar by lapse of time ; but when the statutes came fully·to be considered by the court of chancery, they were adopted, and the same operation given to them there, in respect to all legal claims, as if the statutes had expressly mentioned such claims.   In all matters wherein the jurisdiction of chancery and the common law courts was concurrent, the statutes of limitation were adopted in chancery, on two grounds, first, on the ground that equity follows the law ; and secondly, that where a thing is forbidden by law in one form, it shall not be done in another.   It was found in matter of account, for instance, between joint tenants or tenants in common, that the statute limiting the action to six years would be of little avail, if it could be evaded by filing a bill in chancery.   In all such cases of concurrent jurisdiction, therefore, which are numerous, the statutes have uniformly, with the exception of a few early and ill considered cases, been received

implicitly by the court of chancery; and the well settled rule upon authority will allow of their being weakened by exceptions and qualifications to no greater extent than if they had in terms extended to the court of chancery.

So much is premised, without any intention at this stage of the examination to cite authorities in its support. The legal nature of the complainant's claims, and the principles on which I have, so far, supposed they are to be treated, were insisted upon in argument; some author- [ *595 ] ities were mentioned, but none of the doctrine was denied.

With regard to claims of exclusively equitable cognizance, the statutes of limitation are also generally received; but here chancery will sometimes exercise a discretion. The statutes have here been received on principles of analogy; exceptions, therefore, are more freely allowed, and qualifications unknown to the statutes, founded on fraud, trust and a few other grounds, have been considered as admissible.

Another rule, which is one of practice peculiar to the court of chancery, was asserted, and not denied on the argument: it is, that when the bill shows a stale demand on its face, the defendant is not bound, as at law, to plead the statute of limitations; but may set it up by a demurrer. If the complainant mean to avoid the objection in that form by any matter which might be replied in a court of law, he must state such matter in his bill. *Story's Eq. Pl.* § 484, 503. In the case before us, the bill was evidently drawn with that view, and, as in forming my own opinion on this appeal, I have not thought it necessary to go much beyond the principles now mentioned, I intend to do little more than inquire whether the pleader has been successful in showing a claim not barred by the statute of limitations. In doing so, I propose to take the bill in that aspect which looks to the settlement of boundaries. If it be barred in this aspect, the claim for an account falls with it. If not, there remains, such a tenancy in common that the defendants would be liable to account for the rents and profits to the extent of at least six years before the bill was filed.

The complainants insist that the facts stated in their bill make out a subsisting tenancy in common, between them and the defendants; that the latter have worked a confusion of boundaries between the *Duke's farm*, which is their own land holden in severalty, and the common land of both parties, which are the *Dominie's Hook* and *Dominie's Bowery*, and of which the defendants have been for many years in the possession and enjoyment, receiving the rents. The complainants insist that the title to different parts of the latter, and a common possession, were acquired by the parties *to this suit respectively from *Anneke* [ *596 ] *Jans Bogardus*, in a course of devise, descent or purchase, since 1663, which course I shall assume has been traced with sufficient particularity and certainty; and adopting that aspect of the case, independent-

ly of any matter of defence, the complainants would be clearly entitled to an account, and also, I apprehend, to a decree settling boundaries. The bill would make out the possession by the defendants of adjoining lands, one parcel being their own in severalty, and the other in common between both parties; and the confusion charged upon the latter, whether arising from fraud or negligence, was a breach of trust, warranting the interposition of a court of equity, however improper for such a court might be the ordinary conflict of boundaries between owners in severalty. I see no objection, therefore, to the principle of the bill in either aspect; and I do not stop to inquire whether the relative titles or possessions have been deduced or defined with the requisite certainty.

One answer set up by the defendants is, that, admitting the bill to be sufficiently formal in its allegations of title and possession, yet such a character is given to their possession as to take away the supposed relation of tenants in common—indeed to show that it never existed; but that, whatever possession was acquired by them was decidedly *adverse*, and continued for a length of time exceeding twenty years, next before the filing of the bill. If this be so, on the facts stated by it, most clearly there is an end of this controversy.

By demurring, the defendants have admitted all the material facts stated in the bill, and all the legitimate conclusions of law deducible from those facts. We must, therefore, at this stage of the cause, receive the complainants as their own historians. We must treat their history as absolutely authentic, absolutely true, and incapable of qualification by looking into any matters of fact, however well known or verified by proceedings in other causes.

In testing a defence founded on possession, courts of justice direct their attention to the time during which it has continued, and its char. [ *597 ] acter. The latter respects its notoriety, *the nature of the occupation, and especially, the intention with which it is taken and continued. If it be a naked possession, not accompanied with any claim of right, it will never constitute a bar, but will enure to the advantage of the real owner. It is a possession in his right and for his benefit. The law presumes, till the contrary be shown, that a man in possession without title intends to hold for the true owner; in other words, that he intends to hold honestly so far as he can consistently with holding at all. So if he have a title as tenant in common, he is presumed to hold for himself and his co tenants; and in either case, if his possession be in fact wrongful, in other words, adverse or exclusive, so as to work a statute bar, he must show this in a course of proof, or show that it is admitted by his adversary, in pleading. In the case before us the question turns on admissions in pleading; and I apprehend may be taken as narrowed down to the simple one of what char-

acter we are to ascribe to the defendants' possession from time to time as it was taken by them, in respect to its being adverse or not. That the defendants have been actually possessed of very considerable portions of the land in dispute, for a long time, and from a period prior to 1705, I shall leave to a simple review of the bill, after reminding the court, that no dispute seemed to exist between the learned counsel who argued this cause, that it was sufficiently ancient, distinct and definite, to satisfy the statute of limitations in time, in precision and in notoriety. But when we came in other respects to the character of the possession, viz. whether it was consistent with the claim of the complainants as tenants in common, or adverse, they differed widely, the counsel for the complainants insisting on the former, and the counsel for the defendants on the latter. So far as the statute of limitations may be concerned, this is the only issue we are called on to decide.

Have the defendants then uniformly, continuously, definitely and notoriously been in possession *adversely* to the complainants, for a period of twenty years before the bill was filed? Another form of putting the question is with what intent, *quo animo*, in the legal phrase, have the defendants accompanied their possession; and has that *quo *animo* [ *598 ] been indicated by acts calculated to exclude the complainants from all participation as tenants in common?

In 1705, the defendants obtained a grant of the *Duke's farm*, on their own petition. The bill states that they artfully presented to the government, in their petition, such a description of the farm as left the northern boundary ambiguous. This northern boundary was the dividing line between the Duke's farm and the land of the complainants, and should have been so accurately marked and described as to render the separation entirely obvious to the adjoining proprietors. But it is said the defendants had already formed the intention to possess themselves of the *Bogardus lands* as being part of the *Duke's farm*, and had introduced the ambiguity in order to subserve that intention. Not being definitely limited on the north, this circumstance opened the door for pretending that their grant of the Duke's farm comprehended the Bogardus lands; and it was for the fraudulent purpose of following out such pretension by actual encroachments, that they had sought to procure the equivocal grant. It is said they succeeded in imposing upon the government, and that their purpose soon after became quite manifest by their conduct. Taking up the story, at this stage, more nearly in the language of the bill, we are told that but a small part of the Bogardus lands were improved or enclosed. That the defendants proceeded to act on their original policy, by making considerable encroachments prior to the American revolution. Their course was to take such possessions from time to time as they believed would eventually ripen into a title. In this way they made a variety of lodgments, though resisted by the Bogardus heirs. The defend-

ants persevered, with intent to deprive those heirs of their birthright. Many of them were constrained to abandon their possessions by the delendants' habitual use of menaces, the frequent exercise of actual violence, such as pulling down fences and improvements, burning them riotously, threatening suits and imprisonment, and occasionally resorting to the temptation of pecuniary offers. They boasted of their wealth and power, and declared that they would never desist from their purpose of getting full possession. [ *599 ] *In this way, the more timid occupants were induced either to quit their possessions, or to take title under the defendants.

This brings us to the year 1785, down to which time, notwithstanding the disadvantages under which the Bogardus heirs labored, several among them, including one *Cornelius Bogardus*, kept possession of large portions of their land, claiming title for themselves and their co-heirs. The bill characterizes these encroachments at every step as wrongful, the defendants being fully aware that they were acting illegally, and having in view their original design. So far there is no dispute that they proceeded with an adverse claim of title, and took such a possession as would have constituted a bar by the statute of limitations, had it continued for twenty years, and not been qualified with the imputed *scienter* of wrong and fraud.

This brings us to the deed from *Cornelius Bogardus* to the defendants, which is much relied on as changing the relation of the parties from that of enemies to friends—from that of adverse holders to tenants in common. Cornelius was a common proprietor of the land in dispute, and stood foremost among those descendants of *Anneke Jans Bogardas*, who had sturdily opposed the encroachments. He (says the bill) had tenants, and divers portions in fence, and was therefore a prominent object of persecution for years, both before and after the American revolution. His fences were prostrated in the night and burnt by numerous parties of men acting for the church, and who turned in their cattle and devoured his crops. Thus he suffered long and severely; and being poor, was successfully assailed with an offer of £700, in consideration of which he granted and conveyed to the defendants, who claim that their title under such grant is good and valid. He giving way, the defendants were let into the general and unrestrained possession of large portions of the land. The bill charges that the defendants offered the £700 by way of purchasing Cornelius' birth-right: and that taking the deed and being let into possession, they *by this means* became seized and possessed as tenants in common, and *in this manner and rela-* [ *600 ] *tion* they continued to occupy till the filing of the bill in *1834, inasmuch as no subsequent event or occurrences happened to change in that respect the character of their possession.

The allegation, however, almost immediately follows, that the defendants'

conduct has since been such in regard to that deed as to indicate the unfairness of their original design. That they have been cautious in its exhibition, refused to record it, and generally kept it in profound secrecy, affecting even to doubt its existence, fearing that the heirs might claim it as an admission of a tenancy in common. In truth, the great reason for obtaining the deed was a pending proceeding before the legislature to question their title. They therefore obtained and exhibited it to the legislature as covering a part of the Duke's farm—in other words, their own farm. That excepting this and the production of the deed in 1807, in defending themselves against a claim by some of the *Bogardus heirs*, they have uniformly concealed the deed, and affected to hold the lands as if none had been received.

This part of the bill calls for more particular attention, because it is relied upon as containing averments, that the defendants, by the act of taking various possessions under the deed became tenants in common, and that they have since continued to hold as such. Therefore it seeks to infer that the adverse character of their possession was taken away. I am not disposed to deny, that had these averments stood alone, although they are not direct, yet they might be received as of the import contended for. The allegations are, that by means of the deed from, and possession under Cornelius, the defendants became tenants in common, and had held to this day in that relation. True all this is obviously stated as an inference from the naked act of taking possession under the deed, without showing what sort of a deed it was. It might on its face have negatived all idea of conveying Cornelius' common right. But perhaps the presumption would be, that both parties were dealing, and intended to deal in his undivided share as a tenant in common. That inference standing unrebutted, would, I should think, be about equivalent to an independent averment that *the defend- [ *601 ] ants had taken and held as tenants in common with the Bogardus heirs, from the year 1785. But taken with its surrounding circumstances, the acts and intents which preceded and followed the deed, it seems to me that the inferential allegation is completely overcome. From the year 1705, down to the date of the deed, the defendants had entertained the settled design, coeval with their petition for a grant of the Duke's farm, to claim the Bogardus lands in severalty as a part of their grant. They had prosecuted that design through the instrumentality of threats, of persecution, of riotous invasion and on some occasions in a spirit of vandal ferocity. A part of their system when these failed, was a resort to pecuniary appliances. They bought out the more obstinate inhabitants, for the very purpose of acquiring and extending adverse possession in pursuance of their general design. With Cornelius among others, they had utterly failed of success by the more hostile means of incursion. They therefore bargained with him to

leave the land, taking some sort of conveyance.   But the bill alleges that so far from any intent to come in as tenants in common, it was for the very purpose of exhibiting it to the legislature as covering a portion of the land contained *in their own grant* from the crown.   They generally concealed it among their private archives; and it is not said, that even when, on one occasion, they produced it in defence of an action, they claimed under it as passing a right in common.   They feared that if seen, the Bogardus heirs might seek to infer that they held in common; and finally we a͏́re told that, with the two exceptions mentioned, they have uniformly concealed the deed, and affected to hold the lands in question as if none had been received. Nay, one ef those very instances which are insisted on as exceptions, was an adverse claim addressed to the legislature, and the other is in itself entirely equivocal.   It would be a strained and unnatural construction to suppose that in either case, they meant to admit the claim of the Bogardus heirs.

Now although a man who may hold possession rightfully as a tenant in common, presumptively refers himself to that right, yet the contrary may be shown; and if his conduct *be such as to satisfy the mind that he means to hold out his co-tenants, and he does in fact exclude them, this is an ouster: and his possession from that time becomes adverse within the meaning of the statute of limitations, equally so as if he had never any right to claim as tenant in common.   It by no means follows, therefore, that even had the deed from Cornelius expressly mention-ed his right as a tenant in common, the defendants were necessarily tied up to hold in that relation.   They might at any moment break the connec-tion, by openly disavowing it; and from that time the statute of limitations would begin to run.   Can there be any doubt in this case, cn͏̓ what is stated by the bill, that the defendants have done more; that they have not mere-ly broken a connection in common, but that it never existed in fact; that they always intended to claim the land in question as their own without con-ceding the right of participation to any other?   I should think the bill leaves no room for doubt.   But even should the court be of opinion that the bill has, in the mode of stating the case, left the matter equal between the par-ties, the rule of construction comes against the complainants, that ambiguity in the language of their pleader shall be turned against them.

[ *602 ]

The year 1785 seems to have witnessed the final reduction of the disput-ed territory.   When Cornelius and his tenants gave way, the contest became hopeless.   At any rate the bill charges no new and distinct act of taking possession after that year, so that all the land in dispute must be taken to have been held and claimed in severalty for nearly fifty years.

But the bill seems to have been drawn on the assumption that in pro-portion as the defendants' encroachments were committed under a *conscious-*

Albany, December, 1840.—Humbert v. Trinity Church.

*ness* that they were depriving the Bogardus heirs of their birth-right, and in proportion as the defendants were, therefore, put to sinister expedients in the prosecution of their design, their claim to protection under the statute of limitations is weakened. The bill abounds with imputations of their knowledge that they wanted even a color of right; and every step is referred to their preconcerted design of 1705 : the design of claiming the Bogardus *lands as a part of their own. In this way it [ *603 ] cannot be denied that the bill makes out a case of strong moral transgression ; and the question thus raised is, whether a plaintiff, lying by and forbearing to bring his action till after the time in the statute of limitations shall have run against him, can excuse his negligence by the fact *that the defendant knew all along he was in the wrong.* If the statute is to become unavailing on the ground that the wrongdoer knows he has been withholding an acknowledged right, it is obvious that it can very rarely be used as a protection ; and the forms of pleading have been entirely mistaken for centuries. It will no longer be sufficient, even in *assampsit,* simply to deny that the defendant promised or that the action accrued within six years. The plea should be that he has honestly withheld the debt ; or at least the plaintiff may reply that the defendant withheld it under a consciousness that the delay was wrongful ; and the issue will thus always be joined upon his integrity. So an action of *trespass* could never be barred by the lapse of six years, unless the defendant could show the trespass to have been innocent. But it is entirely obvious that none of the statutes of limitation proceed upon such ground. Whatever the character of the injury, and whether committed in good or bad faith, the statute bases itself upon time. The civil remedy is cut off in two, four, six, twenty or twenty-five years, except it be impeded by certain specified disabilities, such as infancy, coverture, &c. In like manner public prosecutions even for very black crimes are barred by the lapse of three years. The statutes limiting the right of entry into land and the right of action for real estate, speak the same language and must be construed by the same rules. If the claimant have not been in possession actually or constructively within twenty years, he loses the right to his ejectment. The 2 *R. S.* 221, 2*d ed.* § 5 declares, that " no action for the recovery of any lands, &c. or the possession thereof, shall be maintained, unless it appear that the plaintiff, his ancestor, predecessor or grantor, was seized or possessed of the premises in question within twenty years before the commencement of such action." The only exceptions are mentioned in § 16. If any person *entitled to commence any ac- [ *604 ] tion, &c. be at the time the title descended or accrued within the age of twenty-one years insane, imprisoned or a married woman, such person may sue within ten years after the disability shall have ceased. These disabilities can no more be multiplied at law or in equity, when a legal right

comes into question, than they can in an action of slander or assault and battery. Possession by the defendant with a claim of title for twenty years, can no more be answered by averring that he knew he was wrong, than could the bar of two years, in slander, by the known falsehood of the libel for which it is prosecuted. So long as a man is in possession of land claiming title, however wrongfully, and with whatever degree of knowlege that he has no right, so long the real owner is out of possession in a constructive as well as an actual sense. It is of the nature of the statute of limitations when applied to civil actions, in effect, to mature a wrong into a right, by cutting off the remedy. To warrant its application in ejectment, the books require *color of title*, by deed or other documental semblance of right in the defendant, only when the defence is founded on a *constructive adverse possession*. But neither a deed nor any equivalent muniment is necessary, where the possession is indicated by *actual occupation, and any other evidence of an adverse claim exists*. The muniment is but one circumstance by which to make out an adverse possession. An *oral claim* of exclusive title or any other circumstances by which the absolute owner of land is distinguished from the naked possessor are equally admissible, and may be equally satisfactory. It was very properly conceded, on the argument of this cause, by the counsel for the appellants, that a claim of title, even under a paper altogether void and inoperative as a deed, will yet characterize a possession as adverse within the statute of limitations.

Nor can it be received as an objection, that the possession and claim of title are by the agents or tenants of a *corporation* incapable [ *605 ] by law of taking lands.* It is said that the *law will not do an idle ething; that by its own operation, it will not cast a title upon on not competent to take as a purchaser, any more than it will carry land by descent to an alien. The answer was properly given at the bar, that the argument confounds the acquisition of title with the cutting off a remedy. The plaintiff is barred of his action because he has been shut out of possession by an adverse claimant for 20 years. We need only look into the bill before us to see that a corporation, though wanting the legal authority to purchase, has yet the power of actual ouster in an eminent degree, and of actually enjoying land for 20 years, several times told, claiming in fee, and excluding the real owner. Of such an owner, possession within twenty

---

* It was stated in the bill, that by the act of incorporation of Trinity Church, the income of the church arising from lands was limited to £500, and it was charged that in 1804, and since, the income of the church from lands was more than five times that sum, and it was insisted that in such a state of things it was impossible for the corporation to acquire farther estates than were granted to them in 1705, either by *operation of law*, or *otherwise*, until their legal capacity for such acquisition should be enlarged. It is in respect to this portion of the bill, and the arguments founded upon it, that the judge speaks in this part of the opinion delivered by him.

years can no more be predicated than if the wrongful claimant had been a natural person. The remedy is therefore gone. Admit that the law will cast no title on the corporation, the answer, in the words of the statute, is equally fatal : " You have been out of possession for more than twenty years, and are thus disqualified to maintain an action to recover your land against me or any other."

But the complainants say that they and those under whom they claim, remained ignorant of their wrongs until within two years before their bill was filed. I think they show that this is highly improbable ; not to say impossible. It is incompatible with the facts that the resistance of their predecessors was coeval with the open encroachments of the defendants, and that both were continued, so that the defendants never held their possession quietly for twenty years together, till after 1785. It is enough, however, to say that ignorance of a plaintiff's wrong, is not among the disabilities enumerated by the statute of limitations, nor has it, when considered in the abstract, ever been regarded either at law or in equity, as coming within the principle of the enumeration. The question was   [ *606 ] recently considered by the court of king's bench, in *Granger* v. *George*, 5 *Barn. & Cres.* 149, 7 *Dowl. & Ryl.* 729, *S. C.,* and the very point of ignorance ruled against the plaintiff. How it would be regarded on a merely equitable claim, may be inferred from what was said by Sir Thomas Plumer, in *Cholmondely* v. *Clinton*, 2 *Jac. & Walk.* 139, 142. He denies that it could be listened to at law, and infers that it is equally inadmissible in equity.

This ignorance, however, is not suffered to stand in the abstract. Another ground taken by the bill is, that the system of wrongful intrusion imputed to the defendants, was concocted and pursued with a *fraudulent intent ;* and it is averred that their scheme was so secret and conducted with so much art for a period of one hundred and thirty years, that none of the Bogardus heirs discovered the original design till within a very short time previous to the filing of the bill. But the answer comes again : the complainants are before us for the purpose of enforcing a legal claim. The statute has told us in so many words what alone will save the right of entry or action against the lapse of the twenty years. These are infancy, coverture, and other disabilities or impediments expressly named. Still other impediments may have been equally worthy of enumeration ; and that the defendant committed the wrong with a secret and impenetrable design to avail himself of the statute of limitations, and succeeded in covering up his fraud till the time had expired, may have been one of them. But the reasons are obvious, and authorities quite uniform against going beyond the express enumeration in the statute. Among other qualifications sought to be engrafted upon it, *fraud* has been expressly repudiated by several cases. The

question has been before the supreme court in three successive instances. The first was in *Troup* v. *Smith's Ex'rs*, 20 *Johns. R.* 33. The case was decided in 1822. After a full argument, presenting the English and American authorities up to that time, Chief Justice Spencer went over them, and concluded the unanimous opinion of the court in these words:

[ *607 ] " We wish to be understood as deciding the cause *on the ground, that whether there was a fraudulent concealment or not, so as to prevent the plaintiff's discovering the fraud until within six years before the commencement of this suit, sitting as a court of law and bound by the express provisions of the statute, we could not notice the fraud so as to take the case out of the statute." The same point was again resolved by the same court in 1830, *Leonard* v. *Pitney*, 5 *Wendell*, 30. And still again in 1837, *Allen* v. *Mille*, 17 *id.* 202. All these were cases where the injury was committed fraudulently, and kept so veiled that no remedy could be had till the statute had run. In the two first cases the mischief was not even felt till after the six years had elapsed. All the cases were fully argued and much considered by the supreme court, who united in sustaining the rule laid down by Chief Justice Spencer in the first. The last case repeats and adopts his very words. The same thing was held in *Callis* v. *Waddy*, 2 *Munf.* 511, and *Hamilton* v. *Shepperd*, 3 *Murph.* 115.

Thus stands the matter at law. I will not go over the cases cited by the learned chancellor to this point, which I perceive relate to questions not directly cognizable at law, but which are more properly such as are dealt with on equitable grounds. I will merely cite a passage or two from what Lord Redesdale said in *Cholmondely* v. *Clinton*, after that cause had reached the house of lords. It is reported in the 4th of *Bligh's Parl. Cas.* (*old series*) 1 *to* 125. At p. 119, Lord Redesdale speaks of the statute limiting an ejectment to twenty years. He says: " I take it to be a positive law which ought to bind all courts ; and, for that reason, I have taken the liberty in another place, to say that I considered it not simply a rule adopted by courts of equity by analogy to what had been done in courts of law under the statute, but that it was a proceeding in obedience to the statute, and that the framers of that statute must have meant that courts of equity should adopt that rule of proceeding." This, it appears to me, is substantially giving up the right to qualify the statute by cases not provided in itself, even while we stand exclusively on equitable ground. It is not necessary to go so

[ *608 ] far here, where the *right in question is in every sense the same as if we were engaged in an action of ejectment or account. Here we must be governed by law and nothing but the law ; and we have seen what that is. To other proofs that we are bound by the law, although sitting in a court of equity on this very question of fraud, may be added the remarks of a learned judge in our neighboring state of North Carolina.

Albany, December, 1840.—Humbert v. Trinity Church.

The question before the court was, whether the statute ran against an unde-tected fraud in the sale of a land warrant; and the supposed rule of equity had been pressed upon the court. Henderson, J. replied that this rule relat-ed to a pure equity only, neither an action on the case nor the subject mat-ter of such an action. He adds : " But if it were on a subject matter cog-nizable at law, and within the cases provided for in the act of limitations, that act is as positive a bar in a court of equity as in a court of law." *Hamilton* v. *Shepperd,* 3 *Murph.* 115, 118. Again, in *Bell* v. *Beeman, id.* 273, 278, he says, " Equity follows the law, and the rights of the parties shall be the same in both courts. They shall not be changed by the com-plainant's choosing his forum."

Such is the settled rule in respect to the shorter statutes of limitation. If a replication of fraud and concealment will not be received even there, as an answer to the delay, there is still less reason for allowing it to over-come the defence of adverse possession; for, however secret the design which led to it, one essential quality of such a possession is, in general dis-tinctness and notoriety. At any rate such was the possession imputed to the defendants. To this may be added the greater lapse of time during which an adverse possession must continue in order to constitute a bar. An actual ouster and levying a fine would have barred the complainants in five years. And no one can doubt that a prosecution of the like design by open and notorious possessions for nearly half a century, some of which were obtained by riots and conflagration, would as effectually put owners upon their guard, as a fine with proclamations ; yet the latter, at the time when these contest-ed possessions were taken, would have worked a final bar after the lapse *of five years only. Such continued to be the law till abol- [ *609 ] ished by the revised statutes of 1830. 2 *R. S.* 265, 2d ed. § 24.

Nor did those statutes cut off the wrongful holder of land from the right to limitation equally summary in another mode. They substituted the more fair and just method of a notice, to litigate which if not obeyed within a very short time by any one claiming title, and having the notice served upon him, comes with all the force of direct *res judicata,* and estops him forever. 2 *R. S.* 238, 2d ed. pt. 3, ch. 5, *tit.* 2. 3 *id.* appendix, p. 706, note of revisers.

I mention these things to show with how much anxiety the law extends its protection over the actual occupant. Statutes limiting real actions generally operate in favor of the men who cultivate the soil, or inhabit the dwelling houses of the country ; and cannot discriminate between the rich and the poor, the powerful and the weak, the wise and the ignorant. Looking at their tendency to encourage men not only in the pursuits of agriculture, but every great interest of the nation, an argument of policy arises for their equal and steady application, even more strong than of statutes which passed

to limit personal actions.  All, however, were framed on the most salutary principles of general policy.  They have, with great propriety, been termed statutes of repose.  They fix a term broadly marked and easy of proof, at at which litigation is arrested ;  beyond which every man is enabled to pronounce that his possessions are no longer open to disturbance.  The great object, no doubt, was to interpose the presumption arising from delay against the loss of evidence and the fictions of perjury ; but in this view alone neither open wrong nor established fraud could be admitted as an exception without striking at the principle itself; neither can be received without proof, and that would bring back the very danger which the statutes were intended to obviate.  An admission of the fraud in the course of pleading, as in the case at bar, forms no exception.  A man circulates a secret slander, by which his neighbor, after the lapse of two years, for the first time finds his character to have been ruined.

[ *610 ]  The secrecy was *for the fraudulent purpose of evading the statute limit of the two years.  He sues.  The slanderer pleads the statute ; and the plaintiff replies the fraudulent concealment, and his consesequent ignorance of the injury.  No lawyer would doubt that the defendant might demur, thereby admitting the fraud.  He has but one of two courses ; if he be driven from his demurrer, he must take issue on the fraud, and put the plaintiff to his proof.  So in the case at bar, and in every case, by such a circle of pleading, if allowed, the defendant is exposed to that very danger from fabricated evidence against which it was the great purpose of the statute to protect him.  I have drawn an illustration from a very short statute, because it is evident, that the policy becomes more obvious in proportion as the lapse of time is enlarged.  The magnitude of the danger may be heightened by the value to which the property at stake has arisen, the multitude of excited claimants, clamorous of their supposed wrongs, diligent in searching for means of attack and detecting flaws in the defence.  In the very case before us, the protection of the statute is sought to be withdrawn from the defendants, on the ground that they committed a fraud some four full generations before the bill was filed.  We are asked to throw both parties back upon the litigation of a documental title which looks for its origin to the Dutch dynasty before the year 1663 ; and which claims to have reached the complainants mainly in a course of descent from that time.  This, it is conceded, must be done, if at all, not merely through evidence obscured by the ordinary mists of tradition in a settled government, and under a well regulated system of conveyancing; but evidence which comes to us through the mutations of empire, the fury of revolutions, repeated changes in the law of descents, in the law of common assurances, and great defects at all times in the method of perpetuating the evidence of their existence.

There is no case either in England or this state, wherein *fraud* has been re-

ceived as an answer to any statute of limitation, when the statute was interposed against a mere legal claim. *Livingston* v. *The Peru Iron Company*, *9 *Wendell*, 511, is the only case relied on as containing an [ *611 ] intimation that it may be received for such a purpose ; and that was a case in which the statute of limitations was *not* in question. The defendant claimed to be in adverse possession of land under a deed from John Livingston ; and denied, therefore, that while such possession continued, Livingston could convey the land to the complainant. The defendant had no actual possession of a single foot of the land, and his deed was shown to be void for two reasons : first, because the agent of John Livingston had no power to give it ; and secondly, because, if he had, it was obtained fraudulently. Savage, Ch. J. and this court held therefore, that no such constructive adverse possession in the defendant had been made out as disqualified Livingston to part with his title. In other words, a void deed would not raise a constructive adverse possession within the meaning of the statute concerning champerty and maintenance. The transaction was recent, and the possession founded not upon actual occupation, but solely on a deed which was shown to be void. The statute of maintenance has come to be considered with a good deal of disfavor. In the previous case of *Jackson*, *ex dem*, *Hendricks*, v. *Andrews*, 7 *Wendell*, 152, even actual possession claiming under a void deed was denied to be adverse for the purpose of disqualifying the real owner to convey, though clearly since the decision of this court in *La Frombois* v. *Jackson*, *ex dem*. *Smith*, 8 *Cowen*, 589, that would not be so of a deed invoked to make out a possession within the statute of limitations. *For this purpose*, I understand that case to hold it good, in so many words, although void both in respect to a want of title in the grantor and on its face. In short, if the right be claimed under a void deed, it is not therefore less available than a claim *without deed*, which is yet admitted to be a bar. The question is on the *quo animo ;* the intent ; not, I take it, as was suggested in *Livingston* v. *The Peru Iron Company*, the intent to claim honestly ; but the intent to claim at all, right or wrong, with or without knowledge that another has title. The statute in terms bars the man who has been out of possession for twenty years, and no one is the less out of *possession, [ *612 ] because the man who is in may know that. his possession is tortious. After such a length of time it would be dangerous to open an inquiry upon the *bona fides* of the defendant's claim. No English or American case was cited as allowing any such inquiry, and there are some which expressly deny it. It has been denied in North Carolina where the limitation is only seven years. *Den, ex dem. Reddick*, v. *Leggat*, 3 *Murph.* 539. In that case the defendant, as the plaintiff alleged, had fraudulently obtained a grant from the state, which he knew covered a

part of the plaintiff's previous grant ; and held seven years' possession under it. The jury were charged at nisi prius, that no paper writing founded in fraud could operate as color of title in favor of him who was party to the fraud ; and the question of such fraud was left to them on the evidence. They finding for the plaintiff, a new trial was granted. The court remarked that the act of limitation which had passed in 1715 was general, and *not confined* to possessors who were ignorant of any other title ; and the judge delivering their opinion adds, " I would say that the law so construed is politic and wise. On the one hand it may be said that no *mala fide* possessor should acquire a right, no matter how long his possession may have continued. Yet, as parol evidence must be gone into for the purpose of proving the *mala fides,* and it being a thing dependent on knowledge in the possessor, a thing which may be drawn upon him by perjury without a possibility of contradiction, the object of passing the act would be frustrated. It would tend to render titles insecure. For us as expounders of the law, it is sufficient to say that there is no such exception in the words of the act." The ideas thus put forward are not new. They were advanced in the case of *Stowel* v. *Lord Zouch, Plowd. Comm.* 371, in the reign of Queen Elizabeth, and this is moreover a case which shows with with how much strictness even a short statute of limitations in favor of pos*session* should be confined to the words of saving or exception. A statute had declared that a fine should operate as a bar to *all* strangers, saving to all persons and their heirs such right as they had, so that they pursued it by action or entry within five years [ *613 ] *next after proclamations made. It was held that not even *infants* or *femes covert* were excepted, but all limited to the five years, because the statute did not except them in words. It is added, " Whosoever considers that this act was made for the general tranquillity and quiet of inheritances throughout the realm, which are more to be favored than the non-age of an infant in a case which rarely happens, will not think this a hard or rigid construction ; and although sometimes a case happens for which there is no remedy, yet that does by no means impeach the reasonableness or justice of the law, seeing the great number of people who are provided for by it." It is then shown that there might be several successive infancies, and added, " Then the right would come to be tried when it is out of the memory of any man living, and yet in such a dark case a jury would be under the necessity of giving a verdict ; and such darkness and ignorance would be the means of introducing perjury and many other mischiefs which the makers of the act intended to prevent by removing the cause of them, viz. by limiting a certain time, which they did not intend should be exceeded, although some particular persons might suffer by it." *See also Maddock* v. *Bond,* 1 *Irish T. R.* 332, 340. Even while treating of an equity, when *Cholmondely* v.

*Clinton* came to a second hearing at the rolls, 2 *Jac. & Walk.* 155, Sir Thomas Plumer seems to have used language equally strong. He says (speaking of a bar in 20 years by adverse possession,) " The question is never a question as to the title belonging to the plaintiff or defendant ; time shuts out the inquiry into the title, except only to ascertain that the possession has been *de facto* adverse to the claimant ; whether amounting strictly to a disseisen, abatement or intrusion, is of no consequence provided it has been adverse, that is, *inconsistent with the title of the claimant.* The defendant in possession has a right to stand on the defensive, and throw upon the plaintiff the burthen of getting over the preliminary plea in bar by showing a title to sue, that is, by proving that he has made his entry or filed his bill within twenty years. The question respects the plaintiff's right to the remedy, not the defendant's title to the estate. A tortious "act can never be the foundation of a legal, any more than of an    [ *614 ] equitable title. It is no more favored by a court of law than a court of equity, considered nakedly by itself ; but the statute bar arises from other principles, admitting the title if it could be inquired into, to be clearly in favor of the plaintiff and against the defendant, still the question is whether he has prosecuted that title in time. The quiet and repose of the kingdom, the mischief arising from stale demands, the laches and neglect of the rightful holder, and all the other principles of public policy take away the remedy notwithstanding the title *veri domini*, and the tortious holding of the possessor. To advert to the merits is to shift the question from the real subject of inquiry. The case never arrives at that point ; it is stopped *in limine*, equally in the courts of equity as of law. The title is changed in both by the operation of a public law, upon public principles without regard to the original private right. If the negligent owner has forever forfeited by his laches his right to any remedy to recover, he has in effect lost his title to recover. The defendant keeps possession without the possibility of being ever disturbed by any one." We need scarcely go beyond this case to collect the doctrine of adverse possession, as to its nature and effect upon equitable estates. It was twice at the rolls, first before Sir Wm. Grant, 2 *Meriv.* 171, who held there could be no adverse possession of a merely equitable estate. *Id.* 357. This was in 1817. It came on again upon the equity reserved before Sir Thomas Plumer, in 1820, 2 *Jac. & Walk.* 1. He differed from Sir William Grant, and turned the whole cause against the complainant, on the ground that there was an equitable adverse possession. He mentioned the great importance of the question. " One of greater importance," he said, " hardly ever arose in any cause. It is one on which every estate in the kingdom does or may depend. Among other things he adverted to the rule at law. He said, that at law, " the lapse of twenty years affords a substantive insuperable plea in bar. It is the

fixed limit to the remedy ; the *tempus constitutum.* One [ *615 ] day beyond is as much too late as one hundred years. *This is the peremptory inflexible rule at law, fixed by positive statutes, if there has been adverse possession *and no disability or fraud.* No plea of poverty, ignorance or mistake can be of any avail. However clear and indisputable the title if the merits could be inquired into, however demonstratively tortious and wrongful the adverse possession, the fact of such *possession* and the *time* preclude all investigation of the title. The door of justice is closed. The claimant cannot be heard to show his title. It is a decisive answer to him that he comes too late. That alone is the bar. His title remains, but he has lost his remedy. The statute is founded upon the wisest policy, and is consonant to the municipal law of every country. It stands upon the general principle of public utility. *Interest reipublicæ ut sit finis litium,* is a favorite and universal maxim. The public have a great interest in having a known limit fixed by law to litigation, for the quiet of the community, and that there may be a certain fixed period, after which, the possessor may know that his title and right cannot be called in question. It is better that the negligent owner who has omitted to assert his right within the prescribed period, should lose his right, than that an opening should be given to interminable litigation, exposing parties to be harrassed by stale demands after the witnesses of the facts are dead, and the evidence of title lost." *2 Jac. & Walk.* 139, 140. The reasoning and the decision in this case were adverted to and approved by the supreme court of the United States, in *Elmendorf* v. *Taylor,* 10 *Wheat.* 174. The decree in *Cholmondely* v. *Clinton* being enrolled, the complainant appealed to the house of lords, where the cause was decided and the decree affirmed, in 1821. A sketch of the decision in that house is given by a note at the close of the report in 2 *Jac. and Walk.* 189. The full report occupies the whole of the first part of 4 *Bligh's Parl. Cas. old series.* The case was heard throughout on pleadings and proofs, was fully argued in every stage, and elaborate opinions were delivered by very able judges. It may well be inferred, therefore, that the doctrine which finally prevailed was well considered in all its relations. The complainant in that cause had also [ *616 ] *brought an ejectment, and filed his bill for a discovery in aid of that action. To that the defendant demurred, on the ground that, by the complainant's own showing, his remedy was barred. So the lord chancellor held. This was in 1823, and the case is reported in *Turn. and Rus.* 107, 118. At the last page, the lord chancellor adverted to the decision in the house of lords, saying, " I believe it was the intention of the house of lords to state this : that where there has been adverse possession, not accounted for by any disability, as coverture or infancy, for twenty years, a court of equity ought not to interfere."

Albany, December, 1840.—Humbert v. Trinity Church.

I advert to this case the more particularly because I think the argument of Sir Thomas Plumer, which finally prevailed, gives a more just and clear view of the general policy of the statute, and the nature of adverse possession, than any other. One remark I have already cited, in respect to what possession is adverse. Whether it be a disseisin, abatement or intrusion, he says, is of no consequence provided it has been adverse, that is, *inconsistent with the title of the claimant who is out of possession.* It is inconsistency, or such a claim as puts the plaintiff at defiance, no matter how wrongful, or with what degree of known wrong in the possessor, as will be seen in many parts of his opinion. The whole burthen of the argument goes on a claim of title inconsistent with that of the plaintiff, irrespective of the question whether it be wrongful or rightful, with or without color of title, honest or dishonest. After being, in fact, out of possession for twenty years, it is too late to inquire of any fact beyond such possession except the disabilities mentioned in the statute. It is true that he mentions *fraud* as an additional disability even when speaking of the rule at law, and that is again mentioned without disapprobation when he is cited by the supreme court of the United States. I have already had occasion to notice three successive cases decided by the supreme court of this state, in which that has been repudiated ; and I will make a single remark to show why Sir Thomas Plumer stated the exception, and why it cannot be received here unless this court are prepared to overrule what was held by the *supreme [ *617 ] court. The exception, no doubt, referred to the mere dictum of Lord Mansfield in *Bree* v. *Holbeck*, *Doug.* 654. The action was assumpsit, to which the defendant pleaded the statute of limitations. The plaintiff replied stating certain facts which he insisted made out a fraud and fraudulent concealment of the cause of action by the defendant. On demurrer, the court overruled the replication, Lord Mansfield remarking that the replication did not make out a fraud ; and adding that, if one had been made out, the case would have been very different. That dictum has been overruled expressly every time the question has been before the supreme court. They have considered themselves bound by the enumeration of disabilities in the statute. In the very last case, *Allen* v. *Mille*, Chief Justice Nelson says, " Some of the judges in England, in late cases, have intimated an opinion that a fraudulent concealment by the defendant would take the case out of the statute, even at law as well as in equity ; but we are not aware of any decision upon the point. The intimation is founded upon the dictum of Lord Mansfield in *Bree* v. *Holbeck*, which Chief Justice Spencer, in *Troup* v. *Smith*, refused to acknowledge as an authority."

I trust I have already said enough to show that this strictness is not founded on any favor to the man who may be supposed to have committed a fraud, and kept it out of view till the statute shall have run against the injury. It

is the impossibility of deciding after a certain time whether any fraud has been committed or not.   In respect to a fraud of yesterday, the transaction may be so shrouded that the keenest vision cannot determine its character. The fraud must be left to inference from circumstances, and there is always some danger of mistake against innocence.   After the lapse of many years this is peculiarly so ; and the statute of limitations, therefore, interposes a bar to the accusation, as it does of all crimes except murder and treason. Standing on a *pure equity*, I am aware that the contrary has been put very strongly.   Story, J. said in *Prevost* v. *Gratz*, 6 *Wheat.* 497, " In a case where fraud is imputed and proved, length of time ought not, up-
[ *618 ]   on principles of *eternal justice, to be admitted to repel relief.

On the contrary, it would seem that the length of time during which the fraud has been successfully concealed and practised is rather an aggravation of the offence, and calls more loudly upon a court of equity to grant ample and decisive relief."   But he immediately adds the best of all reasons, I think, why, on a question of *legal right*, the inquiry should be cut off after the statute has run.   His words are, " But length of time necessarily obscures all human evidence ; and as it thus removes from the parties all the immediate means to verify the nature of the original transactions, it operates by way of presumption in favor of innocence and against imputation of fraud.   It would be unreasonable, after a great length of time, to require exact proof of all the minute circumstances of any transaction, or to expect a satisfactory explanation of every difficulty real or apparent with which it may be incumbered."   And the court denied relief on these grounds.

Take an illustration of the remarks of Judge Story from the case at bar. The complainants insist on the defendants taking issue and going into proof on the question, whether the corporation had presented a petition in 1705, by which they fraudulently set forth certain boundaries in an obscure way, with the intent to favor the pretence of a right to encroach on their neighbors.   No human being has been alive for several generations who could speak to that question.   The court or jury who are to try it must then make a guess in the best way they can, whether the boundaries were stated honestly.   The defendants say " we have been in adverse possession for nearly fifty years, of the whole land in dispute ; and we decline going into the question, so long as a possession is a bar to all inquiry."   And can there be a doubt, on looking at the statute, and the reason of the thing, that adverse possession was intended to bar an inquiry as well into questions of fraud in acquiring a title as any other ?   Suppose some document to exist on which the complainants may ask a jury to infer fraud, would it not be most unreasonable to require this, when all living testimony to re-
*619 ]   pel it must long since have ceased to exist ?   Why should *not

the statute bar inquiry and cut off the complainants' documental evidence of one kind as well as another?

I am not aware that there can be any pretence of effectual concealment in any thing else. The defendants, in the language of Sir Thomas Plumer, have *de facto* been in possession, claiming a title inconsistent with any in the complainants. The latter have been *de facto*, out of possession, and this appears to have been so with regard to them and those under whom they claim since 1785, nearly fifty years before their bill was filed. Even if both parties should be looked on as tenants in common when the Bogardus deed was obtained, the adverse possession since would be equally fatal; though I think it entirely clear that the bill shows not only an exclusive possession in fact, but that such possession was always adverse.

Being entirely satisfied, therefore, with the ground taken by his honor the chancellor, I have not deemed it necessary to discuss the questions of form upon which the case turned when it was before the vice chancellor. In my view of the case, on the complainants' own showing, there should be an end of this litigation.

I am of opinion that the decree of the chancellor should be affirmed, on the ground that the complainants' claim is barred by the statute of limitations.

By Senator FURMAN. It is admitted if there be a strong equity in favor of the defendants, they cannot be required to condemn themselves or expose their title to the searching questions of a bill of this nature; and that such is also the case where the equities are balanced between the parties. But the complainants here claim that they have a superior equity, or in their own words, a triple equity, based—first, on the allegation of confused boundaries; second, on the claim for an account; and third, on the charge of fraud.

On the first ground, the allegation of confused boundaries, I have examined thoroughly the complainants' bill, and upon carefully reading the description of the first tract of land of 130 acres claimed by that bill, and described as the "Dominie's Hook," on a creek or inlet called Messpats kill, in the city of New-York, I have come to the con- [ *620 ] clusion that it is much more than doubtful whether that tract was ever in the city and county of New-York; and I am the more strongly impressed with that doubt, from the fact that from all the examinations and inquiries which I have made, I cannot discover that there ever was any creek or kill of that name on Manhattan Island. Neither Benson in his Memoir on Ancient Names, Moulton in his View of New-Orange, now New-York, in 1673, or Watson in his Olden Time in New-York, mention it, although they describe all the shores, creeks, inlets, hills and valleys known upon that

island. But I do find there was a Messpats kill on Long Island, in New-town, and that in the same town was a farm called the Bowery, which did anciently belong to the ministers of the Dutch Reformed Church of New-York, and was applied among other things to the support of their poor. This Messpats kill is described by that name in the Newtown purchase, un-der the Dutch government, bearing date the 12th day of April, 1656, and in Gov. Nicoll's patent of Newtown, under the English government, dated March 6, 1666, and in the year 1665 we have a conveyance of a farm at Messpats kill on Long Island, with a habitation and a tobacco house ; and the term *Bowery* was not then or at any period used to designate any par-ticular place, except in the single instance of the street in New-York city, but simply meant a farm ; and so there was Corlear's Bowery, Stuyvesant's Bowery, and many others ; and the same term was also applied to farms at Schenectady. Another reason which induced me thus critically to examine the description of that first tract of land, was that from a perusal of the bill I discovered a plain and apparent error, in fact upon its first page, where it is stated, that in the year 1663, Anneke Jans Bogardus was, in the words of the complainants, then " of the village of Beverwyck in New Nederland, so called, a place now within the city and county of New-York ;" whereas Beverwyck was never within the city and county of New-York, but was one of the names by which Albany was then distinguished. The next piece of land claimed by the bill, being sixty-two acres, is described as [ *621 ] " lying on the south side of the *house to the fence of the land belonging to the company," meaning the Dutch West India Com-pany, and which the complainants locate at Warren street in the city of New-York, and extending therefrom northwardly. In order to ascertain whether there be in reality any such confusion of boundaries, we must in the first place ascertain, if possible, where this land of the company, or the King's farm, as it was afterwards called, was located.

It would be impossible at this distant period to locate accurately by tradi-tion the boundaries of that farm ; no two persons would place it within the same lines by many hundred feet ; and in fact no two writers or historians have ever as yet agreed in their description of it. One, I recollect, states that the company's farm extended to the present Duane street ; another lo-cates it between Liberty and Cortlandt streets, and the complainants define its northern boundary to be at Warren street. Under the Dutch adminis-tration all the rear of the town beyond the walls was cast into farms said to have been six in number, called bouwerys. Van Twiller, the governor, oc-cupied number one, on which was his mansion, and he had his tobacco plant-ation on number two. This No. 1, which was the company's farm, (and with No. 2 afterwards known as the King's farm,) extended from Wall street to Hudson street. No. 2 was next beyond that, north. No. 3 was at

Greenwich. No. 4 was on the plain of Manhattan, including the park or commons to the kolck. All these farms originally belonged to the government, and most of them probably remained public property long after the period designated by the claimants as the time of the acquisition of their title.

There being no dependence to be placed on the recollections of individuals in such matters, as every person must have experienced who has been obliged to test the accuracy of such information, the only remaining evidence on which we can with certainty rely are the ancient maps made about that time. And we fortunately have such evidence existing in the map of the city of New-York made by James Lyne, in the year 1729, which shews that there was no street beyond Broadway westward, and that the land on the western side of that street descended to the beach ; and that [ *622 ] from Cortlandt street northward all the ground west of Broadway was occupied by trees and tillage, and called " *The King's farm.*" One of the boundaries of this farm being said to be partly by a swamp, if that swamp can be shown to have been far to the northeast of the spot where the complainants locate the northerly boundary of the farm at Warren street, it would seem to settle the question in the minds of most reasonable persons. In the year 1775, Broadway, in the vicinity of what is now Grand street, was known as the New Road, and about the site of Grand street was then a swamp, and it was by marching a detachment of the American army along the edge of this swamp to the woods which were then near Richmond Hill, and then through the Greenwich road in the following year, 1776, that they were saved from what was then esteemed almost inevitable destruction. This historical fact is cited for the purpose of showing the locality of that swamp, and taken in connection with the other facts, will prove that the *King's farm* granted to the defendants legitimately covered the premises now claimed by the complainants.

And on the other hand, if we should apply the conflicting descriptions of this farm as given in the various instances to which I have referred, to the fact that the city of New-York, when the grant to the defendants was made, extended to Cortlandt street, in one instance you will see the farm entirely merged in the city, and nothing left for the legislature to grant, and in the other instances the King's farm would have been scarcely large enough for a garden in that day, which was not the case, for it was a large and important tract of land, and was granted to the defendants at that period because they had charge of the temporalities of a church to which the government looked for the propogation of christianity throughout this extensive country. If these things be true, and there can scarcely be a reasonable doubt of them, these complainants have been greatly mistaken in setting up their claims to these lands in the manner they have done ; and that there cannot be any confusion of boundaries as they claim by their bill.

[ *623 ]      *As to the claim for an *account*, in the view which I have taken of the first ground of equity, it cannot possibly exist.    It is shewn by the complainants' bill that the defendants went into possession of the King's Farm in the year 1705, under a grant from the colonial governor; that under color of that grant they came into possession of the premises in question, and public documents now existing show that there is strong reason to believe that about the period of that grant those premises were understood to constitute a part of that farm.    Does not this create a strong equity in favor of the defendants, or at least an equal equity with the complainants ? and therefore this bill cannot be sustained upon the principles before stated.

It may be said that strictly speaking such an examination as I have given the facts in this case is not within the scope of an opinion upon this state of the pleadings—that may be so—but in a case of such great moment, one involved in the immense expense which has attended and will attend this litigation, I have deemed it my duty to lay before the parties interested such views as I have entertained of those facts, hoping it may be attended with beneficial consequences.

As to the third ground, the charge of *fraud*, as I intend to examine that in connection with the ground of defence set up under the statute of limitations, I shall leave it for the present.

Teller, one of the complainants, derives his descent from the daughter of Sarah Roeloff; and in order to get rid of the effect of a misjoinder of parties complainant having interest, with those having none, which it is charged is fatal in a bill of this kind, it is insisted that the daughter of Sarah Roeloff died when the Dutch law was in full force, and that her children all equally inherited.    Whereas on the other side it is alleged that she died under the English law, and the descent was therefore liable to the law of primogeniture.

The vice chancellor of the first circuit holds that the English common law was, as a matter of course, introduced into this colony immediately after the conquest of 1664 ; and in that I am inclined to think he is right, [ *624 ]      notwithstanding *the provision in the articles of capitulation as to the Dutch customs of inheritances.    But it is not necessary to contend for that point here ; it is sufficient for all the purposes of this decision that the English law was established here in the year 1674.    The Dutch recaptured the colony in 1673, which act of itself put an end to and extinguished all the privileges and reservations in the articles of capitulation of August, 1664 ; and they retained it until October 31, 1674, when they ceded it to the English in exchange for Surinam.    The first English governor after this cession, Sir Edward Andros, on the 9th of November following, issued his proclamation, declaring " that the known book of laws formerly established and in force under his royal highness' gevernment is now

again confirmed by his royal highness, the which are to be observed and practised," &c. What was the meaning and intent of this proclamation is evident from the acts which followed its promulgation. Accordingly in the city of New-York, at a term of the mayor's court held March 13, 1674-5, proclamation was made of the governor's order that all persons intending to continue under the English government should come in at the ringing of the bell on the next Monday, to take the oaths of allegiance and fidelity. On the day mentioned, Cornelius Stenwyck, William Beeckman, Nicholas Bayard, Johannes De Piester, and divers others appeared and demanded a confirmation of their former privileges granted them by Gov. Nicolls, who signed the articles of capitulation. The president requested to know what they were. They answered, " 1. To have the liberty of the church. 2. That their people shall not be prest. 3. That the article of inheritances be confirmed. 4. That they shall not be obliged to take up arms against their own nation." All which they requested the court to inform the governor of, previous to taking the oaths, (being the same privileges as to the Dutch inheritances reserved by the articles of 1664.) The governor's answer was— " That without condition, articles or provisoes, they must take the oaths, otherwise to stand to the censure and penalty in the laws set forth. And at five meetings of the court subsequently, 314 citizens took the oaths required.

*There has been considerable anxiety manifested in the course [ *625 ] of this argument, to show that there were no colonial laws previous to the enactments of 1691, or that they were of such a loose and vague description as to merit no attention ; and that even those had probably been lost or destroyed ; and for that purpose, 2 *Graham's History of the United States*, 225, *and Smith's History of New-York*, 4to. 124, *have been cited.* It is really strange how such matters get into histories, and pass from one age to another without contradiction. The truth is that those laws of the colony of New-York enacted in the years 1683,84 and 85, are generally as well worthy of attention as any which have been passed since, but never having been printed, the public know little or nothing about them ; and they are all now preserved in the office of the secretary of state. But it would be well probably if those laws could be discredited in this case for they show clearly that the English common law was established in this colony immediately after its cession by the Dutch in 1674, if not previously. Thus we find by the charter of liberties enacted in 1683, it is provided that every freeholder shall have a vote in the election of representatives to the general assembly, and the article concludes in the following language : " By freeholders is understood every one who is so understood according to the laws of England." The same charter also declares, " That from henceforward no lands within this province shall bè esteemed or accompted as a chattel or personal

estate, but an estate of inheritance, according to the customs and practice of his Majesty's realme of England." To show that they meant the same should be conveyed as lands were in England, they also by the same instrument enact—" that no estate of a feme covert shall be sold or conveyed, but by deed acknowledged by her in some court of record, the woman being secretly examined if she doth it freely without the threats or compulsion of her husband."

This does not look as if the law was vague and indefinite, and to use the words of one of the authorities cited, shew there was any difficulty in knowing what the law was.

[ *626 ]    *But this is not all the proof which exists from our public records and laws, which show that the English common law was adopted in this colony as early at least as I contend for, if the Dutch law ever existed, and was recognized after August, 1664. During the same session the legislature, October 29, 1683, passed " An act to settle courts of Justice," by which they established a " high court of chancery"—" to hear and determine all matters in equity"—and a common law court, occupying the position of our present supreme court, with " power and jurisdiction to hear, try and determine all matters, causes and cases, capital, criminal or civil, and causes tryable at common law." It is further shown that the English common law was so established in this colony, and that for that reason the colonial legislature deemed it necessary on the same day on which they passed the above law establishing those courts of equity and law, to enact " An act for regulating former mortgages," the object of which was to confirm some mortgages which had been given according to the Dutch mode of conveyancing, provided they should be foreclosed or renewed within eighteen months. And in the preamble of this act they recite—that " it hath been the custom and practice of the ancient inhabitants of this province commonly called Dutch, to use and exercise the methods of their own nation in mortgages of lands, houses and tenements, *which is not according to the usage and method of England, and the now established laws of this province.*"

It has been urged by the counsel for the complainants that there were now existing many estates held under the Dutch conveyances made many years subsequent to the articles of capitulation, which conveyances were bad at the common law, and that therefore the inference was irresistible that the Dutch law continued in force for a long series of years subsequent to the capitulation of the year 1664. That such conveyances were made, there is not any doubt, and it is equally clear, that they were bad at common law, but the inference so sought to be drawn, does not arise, and is rebutted by the facts now existing, as shewn by the statute last above cited in relation to the Dutch mortgages; and also from the fact that the

colonial legislature *from time to time enacted laws for the pur- [ *627 ] pose of confirming the estates said to be created under those conveyances, which would not have been necessary, if it was true that the Dutch law existed in force as thus claimed. So by the " Act of settlement," passed November 2d, 1683, they confirmed the titles of all persons who had been in the actual possession of lands for four years prior to the passage of that law ; reserving the right of " all persons under age, feme covert, *non compos mentis*, imprisoned, or beyond the seas"—thus again showing most clearly, that in all matters relating to estates, they were governed by the common law, and not by the civil law as established under the Dutch government ; and they required this act of settlement to be published and proclaimed at the town house in each town in the province, three several days within four months after its passage. And so the very instance cited by the counsel of the devise of the manor of Fordham to the Dutch reformed church in New-York, proves my position ; for if it had been good under the Dutch law, and that law had been in force when the devise was made, it would not have been necessary to obtain its confirmation from the colonial legislature, in the year 1755.

The same legislature also in the same year, 1683, by " An act to prevent frauds in conveyancing lands," and by " An act to prevent deceit and forgery," adopted the English common law in relation to conveyancing and livery of seisin ; and they also at the same time declared that the same should not " include the former deeds, mortgages or conveyances, but leave them in the same condition as they were before the passage of the act." Our ancient statutes and public records thus teem with evidence tending to show that the common law of England was the law of the land in this colony from the year 1674 ; and the reason why so little is said on that point in the statutes subsequent to the year 1691, is that it was regarded as settled by previous enactments. If this was not the fact, the various courts of the province, and among them those of the highest judicial authority, must have existed for many years without any legal basis ; a supposition too absurd to be entertained for one moment. That *historians who [ *628 ] have written since the period of our revolutionary contest, or even those who framed their works some sixty or seventy years after those enactments, should have fallen into the error of supposing those statutes had no existence, or were lost, is not so very strange, when we are informed that none of the statutes of this colony prior to the year 1691 were ever printed, with the exception of one or two single acts ; and that but three complete manuscript copies of those statutes have ever existed, one of which was preserved in the office of the secretary of state, now in the city of Albany ; another in the office of the clerk or register in Kings county, where it still remains, although not now, from its great age, in an entirely perfect state ;

and the third copy was in the clerk's office at Southampton, in Suffolk county. Indeed, so little has the attention of the public been called to this curious and valuable body of laws, that one historian, the Hon. Mr. Wood, in the earlier edition of his history of Long Island, asserted that no legislature sat in this colony between the year 1684 and 1691,'and was not convinced of his error until some original acts were shown which had been passed at the session of 1685, and he was undoubtedly as firmly convinced that he was correct in his assertion, as ever Mr. Graham or Mr. Smith could have been as to the truth of their allegations that those laws were vague and indefinite, or had been lost or destroyed.

This settles the question, that when the daughter of Sarah Roeloff died, her estate descended under the English common law ; and therefore the complainant Teller cannot in the manner in which his descent has been traced, have any title to these lands, admitting for argument sake that they belonged to the complainant's ancestor. And he having no interest therein, has no right to file this bill against the defendants, and the same should be dismissed. Teller having been joined with the other complainants in prosecuting this as one undivided claim, it is in my judgment fatal to the whole bill. It is true, there is a strong distinction between joint demands and several demands, and that this distinction has been recognized in the federal courts [ *629 ] of the United States. But it is only where such demands may be disjointed and distinctly appear as to amount and extent, that may be regarded as separate or several demands, so as to authorize the bill to be dismissed as to such of the complainants who have no title, and to be held good as to others ; and not in a case like the present, where the amount and extent of the interest no where appears upon the face of the pleadings, but on the contrary is shewn to be an undivided, indefinite interest, and one which in all human probability never could be ascertained, even by years of labor. A general demurrer to the whole bill has been repeatedly held good, where a party having an interest joins with him as a complainant, another having no interest, if the fact appears upon the face of the pleading, as it does in this instance.

As another ground for sustaining this bill and the claim founded upon it, it is urged that the corporation of Trinity Church was under a disability to acquire title to these premises, they having *at that time* the full amount of revenue allowed by the act of 1704. And to show this, the complainants set forth that act, which declares that the property to be acquired by that corporation shall not exceed the yearly rent of £500 ; and they then allege that in the subsequent year, 1705, the colonial legislature granted to that corporation the Duke's farm, or as it was also called, the King's farm, at the annual rent of 3s. This provision, if confined as the bill seems to claim, to the value of £500 as it then existed, there is nothing to show that these de-

fendants ever did at any time acquire any real estate which was, at the time of its acquisition, above the yearly rent of £500—for I presume no one will contend that upon such a limitation, an estate fairly within it at the time of acquisition will become divested by a subsequent rise in its value.   Such an unreasonable view of the case cannot be pretended by any one who has given it the least thought.   If it should, however, be so contended, then the £500 of the year 1704, is not the £500 of the year 1840, as all must know who have given the subject the least examination, for the decrease in the value of money, and the increase in the value of grain and other commodities have greatly changed *the real amount of that      [ *630 ] restriction.   Such is the principle upon which the fellowships in many of the colleges in England, are retained at this day, although in terms vacated by their corporation statutes made some century or two previous, upon the incumbent obtaining an estate or perpetual pension of the yearly value of £5.   This principle is advocated and sustained in a work of great authority and learning, entitled the " Chronicon Preciosum," by Bishop Fleetwood; published in 8vo. London, in the year 1745.   In this view of the case the objection is without foundation.   But there is another aspect in which it may be regarded, which is equally fatal.   This restriction is a mere question of governmental policy, and individuals, as such, have nothing to do with it, and no control over it : and the utmost that can be said of it is, that the title of the corporation is perfectly good as to the whole world even if it should exceed that restriction in its annual rents, and it is not for that reason void, but only *voidable* at the instance of the supreme power.   In my opinion, however, even this is a strained view of the case.   I do not even believe it to be voidable—the estate must at the time of its acquisition be of a greater yearly income than the amount of the restriction to give that restriction vitality.   And the fact that an estate should many years afterwards accidentally, by building a city upon it, or for any other cause, acquire a greater value, will never authorize the application of that restrictive principle.

I have now disposed of all the material questions arising in this case except that of the *statute of limitations*—the application of which forms one of the most important points to be decided.

The complainants show, upon the face of their bill, that these defendants have been in the exclusive possession of the premises which they now claim for more than forty years, previous to the commencement of the present suit ; and they do not set forth any excuse sufficient at law or in equity to take their case out of the general rule, that a suit will be barred by lapse of time unless commenced within twenty years after the complainant's right of action accrues.   *It is true they do not set this forth in express terms,      [ *631 ] but they do say that before the revolution this corporation obtained possession under claim of the grant of the king's farm, and with the in-

tent to deprive the Bogardus heirs of their estate ; and that they have continued in the possession thereof, and in the actual receipts of the rents and profits ever since.   If this does not constitute an *adverse possession*, that is, a possession inconsistent with any title in the complainants, I must confess that I would find it difficult ever to comprehend the meaning and extent of that term.    The complainants do, it is true, make  many  and  various allegations connected with this admitted possession.   In one of which, after describing certain alleged wrongs and trespasses, they charge, " and in this way a variety of lodgments were  from time to time made by the said corporation in the more accessible and exposed  parts of the Bogardus lands, particularly  the  *Bowery lands* aforesaid, which lay  to the south of Messpats kill, and not far distant from the northerly extremity of the  King's  farm." From what I have previously  said  in  relation  to this farm bounded upon Messpats kill, it must be evident to most persons that this bill has been carefully drawn, not so much with a reference to what can be proved in the case, as to make out a *prima facie* claim which  would  compel  the defendants to exhibit and set forth their title deeds and documents, and thus enable the complainants to avail themselves of  any  weak point which they might discover in them, from carelessness in the mode of preparing papers  at that distant period, or from the loss or destruction of some connecting links in the chain of documentary evidence  during so many ages as have elapsed since this title was originally granted to these defendants ; and it also serves to shade the aspect of that long catalogue of wrongs and grievances elaborately portrayed in the complainants' bill.

All those charges of tearing down fences, and forcible ejectments, are entirely matters of inducement, and not facts important to the decision of this cause ; for, suppose them all true, unless the complainants could establish a clear and good title to the premises in question, they could [ *632 ]    *not sustain their action by reason of those matters, let them be alleged in however strong language.   And further, if their title to the premises was not good, all these ejectments and dispossessions were no more than they deserved for trespassing upon the lands which did not belong to them—which shows conclusively that such matters can only be stated by way of inducement.   These complainants can have no good title  if the law presumes against it, or if the  law  presumes such title to be in another person.   So a receipt for twenty years of rent issuing out of land is on the common principle *prima facie* evidence of title.   *Matthews on Presumptive Evid.* 310.   On the like principle a non-payment for a long period of a rent charged upon land, will operate as a presumptive bar to the grantee of the rent.   *Ibid.* 311.   In this case it appears upon the face of the pleadings that the defendants have been in the receipt of the rents of these premises for about half a century ; and that the complainants have been out of the

possession of the premises, and out of the receipt of the rents for the same period; and nothing appears, that I can see, from a careful examination of the bill, which can bar the presumptions which thus arise from that state of facts.

The complainants, however, endeavor to get over the plain and obvious provisions of the statute of limitations, by engrafting upon it an exception which it does not contain : that those claiming such title must, in addition to their possession, *know* it to be honest, and their original entry must be made in *good faith.* If this doctrine be sustained, the result will be, that in all trials of ejectment where the title of the defendant is sought to be sustained on a long and quiet possession, it will not be the title which will be tried, but the *good faith* with which the entry upon the land was made, probably a century or more ago, a fact which it would be impossible to show in nine cases out of every ten. It would enable any person, without having the least shadow of title, to harass and perplex with a long and costly litigation, the owners of lands and estates which have been in their families for many ages, by filing bills against them containing allegations of *fraud* in the original entry. It can *never be that such is law in this state, or    [ *633 ] in any other community where the rights of individuals in person and estate are protected. If parties have legal claims to property, they should settle their controversies before time has drawn its veil over all the transactions connected with it; before the witnesses who could testify as to the truth of the facts thus alleged are all departed to their long account ; and before the documents and written evidences which would explain and make clear many things now in doubt and obscurity, are destroyed or lost. If they wait until after all this has taken place, they cannot reasonably expect that any court will give an extra liberal construction to the statute of limitations for the purpose of letting in their claim. They must, for the sake and preservation of their own rights and their own property, and that of the whole community, which would be jeopardized by the establishment of a different rule, look for an application of that statute in its plain and clear interpretation to their case.

I can see no good reason for sustaining this claim, either upon the facts or the law of the case as set forth by the complainants themselves ; and I am therefore in favor of affirming the decree of the chancellor.

By Senator LEE. The decree should be affirmed, for the reasons and on the grounds assigned by the chancellor.

It appears on the face of the bill, that the complainants' claim is barred by lapse of time, as the defendants are admitted to have been in exclusive possession, exercising acts of ownership, as selling, leasing, &c. since 1785 ;

and it is not averred that any ancestors of the complainant have been in possession since that period.

But the bill is drawn with a view to take the case out of the operation of the statute of limitations, and defeat the defence of adverse possession by the charge of *fraudulent intent* in obtaining the original grant and in taking possession. Without examining here how far *fraud* in the inception of an adverse possession invalidates it, or how far the decision of this [ *634 ] court in *Livingston* v. *Peru Iron Company* *is to be regarded as establishing that doctrine, I think that the facts set forth do not warrant the application of that rule in any shape. The charge seems to be that of *fraudulent intent*—morally bad indeed, but not embodied or exhibited in any fraudulent act, instrument or deed. It is therefore wholly intangible. The grant to the church is not questioned; it is confessedly good, whether its boundaries include the contested lands or not. There is no fraudulent *act* charged, such as to vitiate an instrument or deed. The distinction between a fraudulent or illegal *act*, and an *intent or affection of the mind*, not susceptible of proof, is well established in *Van Ness* v. *Hamilton*, 19 *Johns. R.* 372, where Chief Justice Spencer says, " Instead of a trial of fact, the inquiry would be as to the secret operations of the mind and thought," which the court held to be a bad allegation. See to the same purpose the opinion of Mr. Justice Sutherland, in *The People* v. *Manhattan Company*, 9 *Wendell*, 377. Here the bill states that the property is claimed by the defendants under color of the purchase and of the patent from Governor Cornbury ; or, as it is said in another place, they claim that the lands are within the scope of that instrument or patent.

The buying out and receiving a conveyance from one of the heirs against whom the church had long claimed title, and over whose possession they had exercised, or claimed and attempted to exercise acts of ownership, afford no legal presumption of abandonment of prior title. The church has had an exclusive adverse possession since 1785, on the shewing of the bill ; and it there also appears to have commenced under claim of title from the Cornbury patent, a title wholly adverse to that under which the complainants claim.

I cannot see how the question of original title can now be opened, without overthrowing the known conservative policy of our law as to limitation of real actions, and the possession of real estate, as well as disregarding the express provisions of our present and former statutes on these heads. Such a precedent would open the flood-gate to litigation, and shake the security of titles to large tracts, in our older counties, where it is well known [ *635 ] that owing to ancient prejudices *against recording, and other circumstances, large numbers of freeholders have no other evidence

of title, than ancient and hitherto undisputed possession in themselves and their ancestors.

I do not think that the case is affected by the general doctrine claimed to be asserted in *Livingston* v. *Peru Iron Company*, 9 *Wendell*, 515, that possession commencing under a fraudulent or void deed cannot be consider-ed as adverse. Yet lest that decision be supposed so apply here, I would remark, that we ought to distinguish between the reasoning of Chief Justice Savage and the decision of the court, a majority of whom voted with him. The chief justice applies the rule to all possessions claiming to be adverse, whether to bar a recovery or to make void a conveyance by the true owner while out of possession. The case before the court involved only the latter point, and the two questions do not stand on the same ground, nor does the decision of one necessarily dispose of the other. Our revised statutes, in re-enacting the rule of law which had already been established, judicially, declare, " that every grant of land shall be absolutely void, if at the time of the delivery thereof such lands shall be in the actual possession of a per-son claiming under a title adverse to that of the grantor." 1 *R. S.* 739 The decision of the court in the case referred to is claimed as establishing the principle, that a deed fraudulently obtained from the owner, or otherwise voidable by him, does not enable the grantee to claim a title adverse to the true owner so as to invalidate a second conveyance, but that the first being voidable, the second is good, though from a grantor out of possession. But as to possessory titles acquired by lapse of time, the rule previously settled by judicial exposition is thus fixed by legislative enactment : " Whenever the occupant, or those under whom he claims, entered into possession of any premises, under claim of title exclusive of other right, founding such claim upon some written instrument as being a conveyance of the premises in question, and there has been continued occupation and possession of the premises under such claim for twenty years, the premises shall be deemed to be held adversely." 2 *R. S.* 294. Here the fact   [ *636 ] of the claim being founded upon some written instrument, coupled with twenty years' possession, is all that is required in order that " the premises shall be deemed to be held adversely." The question whether the original adverse possession commenced under a valid deed is not to be inquired into, as perhaps it could be under the construction attempted to be given to the decision in *Livingston* v. *The Peru Iron Company*, were it an adverse possession to bar a subsequent deed given by the true owner out of possession, and before any possessory title had accrued by lapse of time.

I have hitherto considered the case of *Livingston* v. *The Peru Iron Company*, as others seem to view it, as establishing the principle, that a deed fraudulently obtained is not available as the foundation of an adverse

possession. For myself I find nothing in that decision warranting that conclusion, and I humbly conceive it settles no such principle, and establishes no such rule. I shall therefore examine it something more at large.

The chancellor had in that case decided that the deed to Murray under which the defendant claimed to derive title, was fraudulently obtained and was voidable on account thereof, but not void; and that the possession under it, there being a subsisting deed, was adverse; and that in consequence thereof the legal title to the premises in question did not pass to the complainant, H. R. Livingston by the deed executed to him by his father, while such premises were thus adversely held and occupied under such voidable deed. I nowhere find in the opinion of the chief justice, that a deed obtained by fraud is thereby rendered void; nor that a possession held under a voidable deed may not be adverse. The positions urged by the chief justice as the foundation of the conclusions to which he arrives in that opinion, are, 1st., that to render a conveyance by the true owner void as to the person claiming by possession, that person must have possession at the time of the execution of such conveyance, and that such possession must be adverse to such owner; that when the person claiming to hold by possession has no written evidence of title, but claims by parol to be the owner, [ *637 ] there must be actual occupancy *a pedis possessio*, a *substantial enclosure by fence, sufficient for the protection of the crops, and it must be marked by definite boundaries, and that there was in that case no such adverse possession and none within any of the acknowledged principles on that subject; that there was nothing like an adverse possession independent of the deed, &c.; and, 2d. that where the possession is claimed to be under a *paper title*, it must be a subsisting and not a void deed, and that such deed must describe the premises claimed to be so held adversely. But he admits that it is not necessary that such deed should be a valid one, or should convey a valid title. He says that it is urged that a deed *voidable* only must be avoided by special pleading. This he does not controvert, but admits, in answering thereto, when the deed is void, the plea is *non est factum;* and that the deed in that case under which the defendant claimed to hold adversely was not merely voidable, but was absolutely void; a nullity and no need. He says a deed under seal cannot be executed by an attorney without authority under seal; that the deed in that case was executed by the Sperrys as the attornies of John Livingston, and that they had no authority from him to execute it; that they had no authority other than a letter from Livingston directing them to *contract* with Palmer for the sale of the premises to him, and this letter containing the directions was obtained by fraud and was therefore void; and that even from the authority thus obtained, the Sperrys entirely departed by executing a full covenant deed of the premises not to Palmer but to Murray. He therefore insists that the deed

thus executed was not the deed of John Livingston, but was utterly void, an entire nullity, and that any pretended entry under it was an entry without any deed. To show that that decision was confined to this one principle, that the deed was void, and not merely voidable, he adds, "It may be said that if the deed is void, then the remedy at law is complete, and a resort to a court of equity was unnecessary." To that objection he says, it is a sufficient answer that the point was not raised nor discussed in the court below, and besides the bill seeks a discovery. These seem to me to be the conclusions of Chief Justice Savage in that case with whom the "court concurred in opinion. I therefore look in vain for any au-    [ *638 ] thority in that case for the principle insisted on, that an adverse possession cannot be set up on a possession obtained under a deed procured with a fraudulent intent, or by acts and representations actually fraudulent.

I further consider it important for the peace and security of titles to uphold the decision of the *vice chancellor* as to one point, i. e., that the manner of acquiring the complainants' titles, the term and extent, not of property, but of estate, should be made to appear, before the defendants can be called upon to answer. The claimants have not deduced a *prima facie* title. For the ordinary period of two or three generations, and until 1786, the law of primogeniture and the preference of the male line prevailed, whatever may have been the earlier law of the colony during the Dutch government, and immediately after the cession. The claimants state that they are "heirs with others," but that is to say no more than that they have a legal claim. In a bill of discovery, the obligation is imposed upon the complainants to make out a *prima facie* title in themselves, before they can call upon the party in possession to disclose his title. The complainants in this case have not made out such presumptive title by descent. They have not shewn how they are heirs. It does not appear whether they claim through the elder line, or whether when they claim through daughters, there was no male line entitled to preference in the order of descent. These are facts within the probable knowledge of the complainants, and essential to be set forth.

I am therefore for affirming the decree.

By Senator LIVINGSTON. It appears that Trinity Church has been in possession of the lands, now claimed by the applicants, certainly ever since the year one thousand seven hundred and eighty-five.

The legislature of this state, in order to quiet old possessions, and render secure the peaceable occupation of lands to persons who had become purchasers, or obtained by inheritance lawfully, and without fraud, as respects themselves, and believing it to be the interest of the people of this "state that claims which had lain dormant for a great length    [ *639 ] of time, should not be brought up to turn men out of the posses-

sion of their lands, and thereby keep open an everlasting door for constant and continued litigation, productive only in many cases of no other result excepting ill will and expense to all the parties, passed a statute limiting the time in which actions to recover lands in this state should be brought; and although this act may not strictly apply to a court of equity, yet that court will, I think, in most, if not in every case, follow the law upon that subject, and more particularly so when the principle of the law is intended to render secure the occupants of land, long possessed, and held without any molestation or hindrance, believing their title to be secure and legal.

I cannot feel myself justified in saying or believing, that the patent from Queen Ann was obtained by fraud. I shall never be ready, or prepared to believe in fraud, merely because it may be presumed. I have a better opinion of mankind, and shall require very substantial proofs, whenever I am compelled to believe it.

I do not find sufficient grounds in the charges contained in this bill, to satisfy my mind that I ought to be instrumental in disturbing a possession of such long standing.

This appears to me to be precisely one of those cases, where the decisions of this court should silence claims of this nature.

The wealth or the poverty of the parties, dwelt upon in the argument, should form no part of our consideration, either one way or the other, in making up our decision.

But in almost every case of such long standing and continued possession, the injury and injustice would appear to fall upon the party holding the estate, as no absolute loss can accrue to the party who never had the property, and who in all probability never knew of any shadow of right he might be supposed to have, until some meddling and perhaps interested friend kindly puts him in the way of going to law, to obtain a phantom, but in reality to lose a substantial fee. That this case has been brought in this way, I do not pretend to say, neither do I believe it.

[ *640 ]      *But I am decidedly opposed to all such antediluvian claims, and if once it is known, or believed, that estates and properties, no matter how long they may have been enjoyed, or honestly possessed by the occupant, can be disturbed and broken up, there is no estate, or farm in the whole country but some individual may be found to bring an outlandish, or outlawed claim, and break up the peace of honest men and their families, and destroy the comfort of whole communities.

I am therefore, decidedly of opinion that the decree of the chancellor should be affirmed.

On the question being put, *Shall this decree be reversed?* all the members

of the court (seventeen being present) answered in the negative. Where-upon the decree of the chancellor was AFFIRMED.